# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BUTTE DIVISION

| | |
|---|---|
| JAMES TARPEY, <br><br> Plaintiff and Counter-Defendant, <br><br> vs. <br><br> UNITED STATES, <br><br> Defendant and Counter-Plaintiff. | CV-17-94-BMM <br><br><br> **ORDER** |

Plaintiff and Counter-Defendant James Tarpey filed a Motion for Summary Judgment Regarding Amount of Penalty on May 16, 2019. (Doc. 52). Defendant and Counter-Plaintiff the United States filed its cross-motion for Summary Judgment Regarding Penalty Amount on June 20, 2019. (Doc. 63). The Court held a hearing on the motions on August 22, 2019, in Butte, Montana.

## BACKGROUND

The background in this matter involves the same facts set forth in the Court's Order granting the United States's Motion for Summary Judgment. (Doc. 51). The Court resolved Tarpey's liability for penalties pursuant to 26 U.S.C. § 6700 in favor of the United States. (Doc. 51 at 21). The Court's Order did not

1

resolve the amount of penalties to be assessed against Tarpey. The parties dispute the amount of penalty for which Tarpey should be liable. The United States requests that the Court enter judgment against Tarpey for the unpaid balance of the § 6700 penalty in the total amount of $9,025,265.24, plus interest. Tarpey asserts that his penalty should be $270,215. The parties filed competing motions for summary judgment regarding the amount of penalty.

## LEGAL STANDARDS

Summary judgment proves appropriate where the movant demonstrates that no genuine dispute exists "as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322-23. If the moving party satisfies that burden, summary judgment shall be granted unless the non-moving party demonstrates "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

## DISCUSSION

The Court determined that the United States had met its burden to establish Tarpey's liability under § 6700(a) in its previous summary judgment order. (Doc. 51). The Court based this determination on its conclusion that the United States had proven the following elements by a preponderance of the evidence to establish

2

a penalty under 26 U.S.C. § 6700(a)(2)(A): (1) that the defendant organized or sold, or participated in the organization or sale of, an entity, plan, or arrangement; (2) that the defendant made or caused to be made, false or fraudulent statements concerning the tax benefits to be derived from the entity, plan, or arrangement; (3) that the defendant knew or had reason to know that the statements were false or fraudulent; and (4) that the defendant's false or fraudulent statements pertained to a material matter. (Doc. 51 at 6, analyzing *United States v. Estate Pres. Servs.*, 202 F.3d 1093, 1098 (9th Cir. 2000)). The current motions for summary judgment concern only the amount of the penalty to be assessed against Tarpey.

Section 6700(a) provides alternative methods for computing the penalty for liability under the statute. The first sentence provides the computation of the penalty. 26 U.S.C. § 6700(a). This sentence sets forth the general rule that the penalty amounts to $1,000 per activity, or if less, 100 percent of the gross income derived from such activity. *Id.* The third and final sentence sets forth the conduct for which the Court determined Tarpey to be liable. *Id.*; (Doc. 51). The third sentence modifies the computation method for conduct involving statements described in paragraph (2)(A) – "false or fraudulent statements." 26 U.S.C.§ 6700(a)(2)(A). The third sentence disregards the $1,000 per activity penalty calculation. *Id.* The third sentence instead directs that the individual stands liable for "50 percent of the gross income derived from the activity" when an individual

3

organized or sold or participated in the organization or sale of an entity, plan, or arrangement under § 6700(a)(1) and makes false or fraudulent statements in connection with the organization of an entity, plan, or arrangement. § 6700(a).

The Court previously determined that Tarpey made false or fraudulent statements in connection with the organization of an entity, plan, or arrangement. (Doc. 51). This determination requires the Court to look to the third sentence of § 6700(a) to determine Tarpey's penalty liability. The penalty amount assessed against Tarpey shall be equal to 50% of the gross income that Tarpey derived from the "activity" at issue. 26 U.S.C. § 6700(a). The parties dispute what constitutes the "activity" for the purposes of calculating Tarpey's penalty liability.

Tarpey seeks to limit the "activity" at issue only to appraisals performed for DFC by Tarpey, and, therefore, seeks to limit the penalty only to income derived from these appraisals. (Doc. 54 at 7). Tarpey asserts that his penalty liability should be limited to the $540,429 that he earned from the appraisals. (*Id.* at 20-21). The parties do not dispute this amount.

Tarpey asserts that each "activity" must be proved separately and that the United States has proven appraisals as the only activity undertaken by Tarpey. (*Id.* at 9). The United States argues, however, that Tarpey derived an additional $18.9 million through DFC from the timeshare donation scheme as a whole because DFC served as Tarpey's alter ego. (Doc. 64). The United States alleges that the Court

4

should impute to Tarpey the full amount derived from DFC. *Id.* The Court must make the threshold determination of what constitutes the "activity" for purposes of computing the penalty under § 6700(a). The Court then must determine, if necessary, whether the alter ego theory presents an appropriate avenue to impute DFC's income to Tarpey.

## I. The "activity" at issue encompasses the entire time-share donation scheme

Tarpey argues that the appraisals of timeshare donations to DFC represent the only activity for which the Court determined him liable. Tarpey asserts that § 6700(a) makes clear that "activity" proves distinct from "plan" or "arrangement." Tarpey argues that this distinction indicates that the penalty must be imposed for each activity that the United States has proven, rather than for the entire plan or arrangement. Tarpey argues that this interpretation required the United States to prove all "activities" that were knowingly false or fraudulent. Tarpey concludes that 50% of his gross income of $540,429 – the amount Tarpey derived in connection with appraisals – constitutes the appropriate penalty.

Contrary to Tarpey's argument, the Court determined in its previous summary judgment order that Tarpey would be liable for penalty conduct under § 6700(a), including liability arising from having made false or fraudulent statements under § 6700(a)(2)(A). (Doc 51). The Court did not limit Tarpey's liability solely to the fraudulent appraisals. The Court's Summary Judgment Order admittedly

5

focused on the conduct regarding the appraisals. This focus on appraisals arose from Tarpey's concession that he had organized or participated in the organization of an entity, plan, or arrangement. (Doc. 38 at 2). Accordingly, the Court's analysis focused primarily on whether Tarpey had made false or fraudulent statements and whether he knew he had made false or fraudulent statements. The Court rejects Tarpey's claim that the Court found him liable only for the specific appraisal activity. The question remains the scope of what the "activity" encompasses. 26 U.S.C. § 6700(a).

The "activity" giving rise to the penalty against Tarpey encompasses the entire arrangement facilitated and organized by Tarpey to solicit timeshare donations, appraise the timeshares, and direct profits to his other organizations. As the Court's previous summary judgment order noted, "Tarpey appraised timeshares, accepted donations, and promised donors charitable contributions on federal tax returns." (Doc. 51 at 20). The Court declines to view in isolation Tarpey's conduct of performing these appraisals.

The appraisals constituted a distinct step within the overarching scheme. The particular, well-defined activity consists of Tarpey and others performing the fraudulent appraisals to inflate the value of the donations and thereby encourage tax-payers to participate through the enticement of a larger tax deduction. This

6

greater participation by tax-payers, in turn, allowed Tarpey's for-profit companies to benefit from the fees associated with the sale of the donated timeshares.

A closer inspection of § 6700(a) supports the Court's conclusion. The penalty computation under § 6700(a) changes when an "activity . . . *involves* a statement described in paragraph (2)(A)." 26 U.S.C. § 6700(a) (emphasis added). The use of the word "involves" signals that the "activity" encompasses more than the conduct of actually having made a false or fraudulent statement under subsection (a)(2)(A). *Id.*

Similarly, subsection (a) provides that the "penalty shall be equal to 50 percent of the gross income derived (or to be derived) from such *activity* by the person on which the penalty is imposed" if the activity involves false or fraudulent statements. 26 U.S.C. § 6700(a) (emphasis added). The statute explicitly assesses the penalty against the income derived from the *activity*. The income derived from the activity, in turn, clearly encompasses subsection (a)(1)(A) and (B), rather than simply the conduct involved in subsection (a)(2)(A), which explicitly refers to statements. 26 U.S.C. § 6700(a). In other words, "activity" also encompasses the organization and sale of a tax scheme and not simply the making of false statements in furtherance of that scheme.

Tarpey points to *Schulz v. United States*, No. 15-cv-01299, 2018 WL 3405240 (N.D. New York July 12, 2018), for the proposition that the "activity"

7

must be a "particular, well-defined activity." (Doc. 72 at 17). The taxpayer in *Schulz* operated two organizations known as We The People for Constitutional Education and We The People Congress (collectively WTP) designed to help people understand the Declaration of Independence and their state and federal constitutions. *Id.* at *2. WTP also distributed materials that advocated for abolition of the withholding tax. *Id.* at *3. Schulz personally carried out WTP's operations. WTP referred to these materials as "Blue Folders." *Id.* Schulz also used WTP's funds to defend himself from IRS actions and litigation. *Id.* He paid corporate expenses with a personal credit card. *Id.*

The government assessed penalties against Schulz for promoting an abusive tax shelter. *Id.* at *4. The government previously had established Schulz's liability based on WTP's distribution of Blue Folders. *Id.* WTP sold these Blue Folders as part of its effort to promote "Petitions for Redress of Grievances" against the United States, including the abolition of the withholding tax. *Id.* The court noted that WTP had engaged in other activities aside from its sale of the Blue Folders. *Id.* at *3. The court limited the government's penalty to income derived from WTP's well-defined activity of 225 distributions of the Blue Folders. *Id.* at *5.

The court concluded that Schulz's penalty should be calculated under the first formula in section (a). This conclusion rendered Schulz liable for "a $1,000

8

penalty for each violation of section 6700" unless Schulz could establish the gross income from the activity had been less than $1,000. *Id.* at *4. The court in *Schulz* assessed the discrete calculation of how many Blue Folders that WTP had sold for purposes of calculating the penalty under the first part of § 6700(a).

The Court declines to cabin Tarpey's "activity" in such a narrow fashion. Here, the Court will apply third sentence of § 6700(a) to compute Tarpey's penalty, as opposed to the formula employed in *Schulz*. Tarpey ran and oversaw the operation of DFC and the related for-profit entities. The Court deems it appropriate to view Tarpey's conduct in a broader context because "section 6700 allows the government to assess a penalty on 'gross income derived or to be derived' from the *tax shelter activity*." *In re MDL-731 Tax Refund Litig. of Organizers and Promoters of Inv. Plans Involving Book Props. Leasing*, 989 F.2d 1290, 1302 (2d Cir. 1993) (emphasis added). The Court views Tarpey's entire time-share donation scheme, including the related for-profit entities, as a "particular, well-defined activity" for purposes of calculating the penalty under § 6700. *Schulz*, 2018 WL 3405240 at *5.

## II. The doctrine of piercing the corporate veil may be used to impute DFC's income to Tarpey

The Court next must determine whether the income derived from DFC properly may be imputed to Tarpey. The Court must make an initial determination of whether the doctrine of piercing the corporate veil may be used in this context

9

specifically. If the doctrine may be used, the Court must analyze whether DFC functioned as Tarpey's alter ego. Tarpey contends that the United States should not be allowed to pierce the corporate veil in this context in light of the Court's determination that Tarpey would be liable only individually for penalty conduct. Tarpey further contends that the United States does not attempt to reach DFC's assets to satisfy an individual tax debt.

### 1. The doctrine of piercing the corporate veil applies here

Courts generally use the doctrine of piercing the corporate veil to "hold an individual liable for a business entity's debts." *Towe Antique Ford Foundation v. I.R.S.*, 999 F.2d 1387, 1390 (9th Cir. 1993). Courts may use a reverse piercing theory to "reach the assets of a corporation to satisfy the tax debt of an individual." *United States v. Stephens*, 670 F. Supp. 2d 1145, 1151-52 (D. Mont. 2009).

Tarpey's argument that the doctrine does not apply ignores two important points. First, § 6700 explicitly includes "50 percent of the gross income derived . . . from such activity by the person on which the penalty is imposed." 26 U.S.C. § 6700. The statute broadly captures income derived by the person from the activity itself. Congress easily could have limited the penalty's reach only to individual income. Congress declined to adopt this limitation. The Court will apply the alter ego theory to determine whether DFC's corporate form should be disregarded and DFC's income properly attributed to Tarpey.

Second, decisions of other federal courts support the application of the doctrine in the context of § 6700 and identify the doctrine as a flexible and equitable remedy. The district court determined in *Schulz* that WTP served as the Schulz's alter-ego. *Schulz*, 2018 WL 3405240, *7. WTP's function as Schulz's alter ego allowed income derived by WTP from the "organizing and promoting [of] an abusive tax shelter" to be imputed to Schulz for purposes of computing the § 6700 penalty. *Id.* at *7.

*Towe Antique* affirms the doctrine's flexible and equitable purpose: "piercing the corporate veil is an equitable remedy used to curb injustices resulting from the improper use of a corporate entity." *Towe Antique*, 999 F.2d at 1391. "Use of this remedy depends entirely upon the circumstances of each case." *Towe Antique*, 999 F.2d at 1392. The Court deems it appropriate to pierce the corporate veil to assess whether DFC's income appropriately should be attributed to Tarpey.

2. **DFC served as Tarpey's alter ego and DFC's income may be attributed to Tarpey for purposes of computing Tarpey's penalty liability**

Courts apply the law of the forum state to determine whether a corporation serves as an alter ego of a taxpayer. *Towe Antique*, 999 F.2d at 1391. Montana law provides no "concrete formula" for a court to disregard the corporate form. *Hando v. PPG Indus., Inc.*, 771 P.2d 956, 960 (Mont. 1989). A party generally first must show that the corporation serves as the alter ego of the individual. *Drilcon, Inc. v.*

11

*Roil Energy Corp., Inc.*, 749 P.2d 1058, 1064 (Mont. 1988). Second, the party must show that the individual used the corporate entity "as a subterfuge to defeat public convenience, justify wrong, or perpetrate fraud." *Id.*

*Towe Antique* provides the following six-factor test to determine whether an entity constitutes an individual's alter-ego under Montana law:

(1) The individual asserts a position of control over the entity;
(2) The individual controls the entity's actions without need to consult others;
(3) The individual uses the entity to shield himself from personal liability;
(4) The individual uses the entity for their own financial benefit;
(5) The individual "mingles" personal affairs in the affairs of the entity; and
(6) The individual uses the entity to assume his or another's debts, or vice versa.

*Towe Antique*, 999 F.2d at 1391.

The district court made several findings in *Towe Antique*. The district court found that Towe acted as the president and sole controlling officer of an antique car museum. *Id.* at 1392. Towe invested the nonprofit's money in a fund that benefitted himself personally. *Id.* Towe additionally employed family members at the museum. *Id.* Towe attempted to shield his personal assets from the IRS by putting his own money into the corporation. *Id.* Towe took actions without the board's knowledge. *Id.* Towe's nonprofit paid for a building that benefited Towe's other business. *Id.* The Ninth Circuit affirmed the district court's determination that the entity constituted Towe's alter-ego. *Id.* at 1395. The United States argues that it has established all six factors under *Towe Antique*.

12

### a. Whether Tarpey held a position of authority and asserted exclusive control over DFC

Tarpey formed DFC, he served as its sole voting member, and he possessed authority to nominate and remove board members. (Doc. 65 at 2-4). Tarpey appointed several board members without their knowledge. (*Id.*). Tarpey directed when and how to amend the bylaws and articles of incorporation. (*Id.* at 4-5). Tarpey publicly identified himself as DFC's general counsel, spokesperson, and president. Tarpey possessed signatory privileges over DFC's bank account. (*Id.* at 5-6). Tarpey served as DFC's point of contact regarding legal matters. (*Id.* at 5). The Court concluded in its prior summary judgment order that Tarpey possessed direct control over DFC. (Doc. 51 at 9).

Tarpey's claim that he did not control DFC's day-to-day operations falls short. He contends that he did not manage the bank account, was unaware that he could sign checks, did not oversee employees and was nothing other than a "voting member" of DFC. The district court in *Towe Antique* reached a similar conclusion regarding Towe's control of the day-to-day operations "despite the fact that other[ board members] perform some administrative functions." *Towe Antique*, 791 F.Supp. 1450, 1454 (D. Mont. March 5, 1992). The district court found it "abundantly clear . . . that it is Edward Towe who, in reality, dominates and controls the affairs of TAFF." *Id.* Similar to *Towe*, here, the fact that other DFC employees performed some duties related to DFC's operations fails to minimize

Tarpey's dominant role within DFC. (*See, e.g.* Doc. 66-1 at 54-64). The Court determines that the United States has met the first and second factors under *Towe Antique*.

### b. Whether Tarpey used DFC to shield himself from personal liability and for his own financial benefit

Tarpey used DFC for his own financial benefit. It is undisputed that Tarpey earned $540,429 from appraisals alone. (Doc. 65 at 11). Tarpey used DFC to funnel profit to his wholly owned for-profit companies, Resort Closings, Inc., and Charity Marketing, Inc. (Doc. 66-1 at 159). During the course of three years, DFC transferred $3.4 million, $4.95 million, and $3.9 million to Tarpey's for-profit entities. (Doc. 65 at 12). Tarpey equated DFC's receipt of time-share donations with the "sweet, sweet sound of money!" (*Id.* at 8-9). DFC initially obtained tax-exempt status. The IRS later revoked this tax-exempt status when it determined that DFC existed primarily to benefit Tarpey. (Doc. 66-1 at 25, Exh. 507). Tarpey's personal financial benefit from DFC and his current attempt to shield himself from penalty liability demonstrates that the United States has met the third and fourth *Towe* factors.

### c. Whether Tarpey mingled his personal and family affairs with DFC's affairs

The record demonstrates that Tarpey mingled his personal affairs with DFC's affairs. Tarpey involved close family members in DFC's operations. Tarpey appointed his brother as DFC's initial president. (Doc. 65 at 3). One of

Tarpey's sisters handled DFC's payroll. (*Id.* at 4). And another of Tarpey's sisters, Suzanne Tarpey, acted as DFC's secretary, treasurer, and bookkeeper. (*Id.*). Suzanne also prepared nearly 600 appraisals for DFC. (*Id.*).

The Ninth Circuit in *Towe Antique* relied, in part, on the "employment opportunities for three members of [Towe's] family" in affirming the district court's determination that Towe had mingled his personal affairs with TAFF. 999 F.2d at 1392. Tarpey directed various donations from DFC. For example, a check drawn from DFC's bank account payed to Great Beginnings Montessori School contained the memo "Tarpey party." (Doc. 73 at 10). Similarly, a DFC check to Big Sky Youth Empowerment Project contained the memo "Jim Tarpey donation." (Doc. 73 at 11). These examples support the United States's claim that Tarpey commingled his affairs and the affairs of DFC.

### d. Whether Tarpey used DFC to assume his debts

The United States argues that Tarpey used DFC to assume his debts, although not to the extent that he used DFC to enrich himself. (Doc. 64 at 16). The Untied States points to Tarpey's signature on a DFC check used to cover a $1,000 donation on behalf of Tarpey and with a memo of "Jim Tarpey donation." (Doc. 65 at 6-7). This factor proves neutral.

### e. Conclusion

The United States has demonstrated that no issues of material fact exist regarding whether DFC served as Tarpey's alter ego. Five of the six factors from *Towe Antique* compel a conclusion that DFC served as Tarpey's alter ego. Using the alter ego theory to attribute DFC's income to Tarpey represents an appropriate use of the "equitable remedy" that will "curb injustices resulting from the improper use of a corporate entity." *Towe Antique*, 999 F.2d at 1391. Both courts in *Schulz* and *Towe Antique* employed the alter ego theory to impute income to an individual for purposes of assessing the penalty under § 6700. The Court agrees that *Schulz* and *Towe Antique* provide persuasive and analogous reasoning to Tarpey's case.

### III. Amount of penalty assessment

The penalty to be assessed against Tarpey represents the final issue before the Court. A presumption of correctness generally attaches to the IRS's assessment of penalties. *See United States v. Stonehill*, 702 F.2d 1288, 1293 (9th Cir. 1983). An evidentiary foundation must support the presumption. *Id.* The United States argues that Tarpey derived $18.9 million dollars from the timeshare donation scheme. The United States calculated this number by looking at DFC's Form 990s and grants that DFC paid from the contributions that DFC received.

Tarpey contends that the presumption of correctness should not attach due to the failure of the United States to offer evidence to support its calculation of its penalty assessment. Tarpey points to an apparent calculation error in Kelley

16

Blaine's affidavit as further evidence that a presumption of correctness should not attach to the IRS's assessment of penalties. (Doc. 66-1 at 255-56). Blaine, a senior attorney at the IRS, submitted an affidavit purporting to demonstrate the balance of the assessed penalties. *Id.* The United States counters that the miscalculation derives from the omission of $194,346.81 in accrued interest.

Tarpey also takes issue with how the United States calculated DFC's gross income. Tarpey points to Line 12 of Form 990, DFC's "total revenue," as the correct amount of DFC's gross income. Tarpey seeks to exclude the non-cash contributions from DFC's gross income. (Doc. 72 at 18-19). Tarpey contends that DFC's total revenue adds up to $2,924,313, and, thus, the penalty should equal half that amount, or $1,462,157. Tarpey submitted a report from Duane Moulton, a certified public accountant, who opined that the IRS incorrectly calculated the penalty and that the proper penalty amount should be $2,462,034.47. (Doc. 53-5 at 4).

The Court declines at this stage to afford the United States's calculation the presumption of correctness. The IRS simply submitted the IRS Forms 4340 in support of its penalty calculation. (Doc. 66-1 at 112-124). The IRS forms provide no detail about how the IRS calculated the penalty. More importantly, the numbers presented in Blaine's affidavit simply do not add up. The Court declines to accept on its face the claim by the United States that the error arose as a result of an

17

omission of calculated interest. Neither Tarpey nor the Court can be expected to divine the method that the United States used to calculate its $9 million penalty request. The discrepancy rises to the level of a genuine issue of material fact that the Court declines to resolve on summary judgment.

## CONCLUSION

The alter-ego theory represents an appropriate doctrine to impute DFC's income to Tarpey. The Court draws no conclusion regarding how much of DFC's income should be attributed to Tarpey or how that amount should be determined. The United States must present a thorough and accurate assessment of Tarpey's penalty amount, to ensure that no double-counting or errors occur.

**IT IS ORDERED** that the United States's Motion for Summary Judgment (Doc. 63) is **GRANTED** in part and **DENIED** in part.

**IT IS ALSO ORDERED** that Tarpey's Motion for Summary Judgment (Doc. 52) is **DENIED**.

DATED this 7th day of November, 2019.

_/s/ Brian Morris_
Brian Morris
United States District Court Judge