IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| JAMES TARPEY,<br><br>    Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | **CV-17-94-BU-BMM**<br><br>**ORDER** |

Plaintiff and Counter-Defendant James Tarpey ("Tarpey") filed a Motion for Summary Judgment Regarding the Amount of Penalty on May 16, 2019. (Doc. 52). Defendant and Counter-Plaintiff the United States ("Government") filed its cross-motion for Summary Judgment Regarding the Penalty Amount on June 20, 2019. (Doc. 63). In response to these motions, the Court demanded that the Government present a "thorough and accurate" assessment of the penalty amount. (Doc. 83 at 18). The Court held a hearing on the appropriate penalty amount on May 5, 2021, in Butte, Montana. (Doc. 122).

## BACKGROUND

Tarpey formed Project Philanthropy, Inc., d/b/a Donate for a Cause ("DFC") in 2006. (Doc. 23 at 4). Tarpey was the sole voting member of DFC. (Doc. 51 at

1

2). Tarpey operated DFC as a timeshare donation program, where timeshare owners could donate their unwanted timeshares for generous tax savings. (Doc. 51 at 2–3). Tarpey also operated Vacation Property Appraisers ("VPA"), which Tarpey used to appraise—for a cost—the donated timeshares. (Doc. 122 at 41). Tarpey founded a for-profit timeshare closing service that operated as Resort Closings, which Tarpey used to handle the real estate closings for timeshares donated to DFC. (Doc. 51 at 2). Tarpey operated two more for-profit entities—Charity Marketing and Timeshare Specialist—to advertise the timeshare donation program to potential donors. (Doc. 122 at 41).

The Government initially filed an action to enjoin Tarpey, DFC, Resort Closings, and others from engaging further in the timeshare donation program and appraisals. *United States v. Tarpey*, 2:15-cv-00072-SEH (Doc. 1 ("*Tarpey I*")). In *Tarpey I*, the Court determined that DFC used conflicted appraisers who overstated the value of the timeshares. *Tarpey I*, (Doc. 1 at 8). DFC falsely told donors they could deduct the full amount of the timeshare and the processing fees charged by DFC. *Id.*, (Doc. 1 at 8). The Court entered final judgments of permanent injunction against all six defendants. *Id.*, (Docs. 36, 88, 89, 90, 103, 124). The Court agreed further with the Government that the timeshare donation program constituted a bogus tax scheme. *Id.*, (Doc. 1).

The Treasury Department then assessed penalties against Tarpey due to conduct at issue in *Tarpey I*. (Doc. 51 at 4). Tarpey brought this preemptive action, *Tarpey II*, against the Government alleging that Tarpey had not overestimated the value of the timeshares and that the Internal Revenue Service ("IRS") inaccurately had assessed penalties against him. (Doc. 51 at 5). The Government filed a counterclaim against Tarpey for the unpaid penalty amount. (Doc. 51 at 5). The Government then moved for summary judgment on the issue of Tarpey's liability under 26 U.S.C. § 6700. (Doc. 28).

To establish § 6700 liability, the Government had to show that (1) Tarpey organized or participated in the organization of an entity, plan, or arrangement; (2) Tarpey made false or fraudulent statements concerning the tax benefits derived from the entity, plan, or arrangement; (3) Tarpey knew or should have known that the statements were false or fraudulent; and (4) the statements pertained to a material matter. (Doc. 51 at 6, *citing United States v. Estate Pres. Servs.*, 202 F.3d 1093, 1098 (9th Cir. 2000)). Tarpey conceded the first element and made no argument on the fourth. (Doc. 51 at 6).

Concerning the second element, the Court found that the overstated appraisals of the timeshares to be donated to DFC constituted false statements because Tarpey had prepared the appraisals himself. (Doc. 51 at 7). To claim a deduction of more than $5,000 for a donated property, a taxpayer must obtain a

3

qualified appraisal. (Doc. 51 at 7, *citing* 26 U.S.C. § 10(f)(11)(C), (E)). A qualified appraisal must be performed by a qualified appraiser. (Doc. 51 at 7, *citing* 26 C.F.R. § 1.170A-13(c)(3)(i)(B)). Tarpey lacked the required independence from DFC to be considered a qualified appraiser. (Doc. 51 at 20). These inflated appraisals resulted in tax avoidance. (*Id.*).

Concerning the third element, Tarpey signed a "Declaration of Appraiser" for each appraisal that he performed. (*Id.*). Part of these forms required Tarpey to acknowledge the Treasury Regulation that excluded him from serving as the appraiser. (*Id.* at 18). Tarpey's acknowledgment that he knew the regulations and his repeated appraisals performed for DFC demonstrates that he knew or had reason to know that his statements were false. (*Id.* at 19). Thus, this Court found Tarpey liable for penalties under § 6700. *Id.*

The Government's Motion for Summary Judgment on Tarpey's liability did not seek resolution of the amount of penalty that Tarpey owed. (Doc. 51 at 5). At that point, the parties disputed the penalty amount that Tarpey owes to the IRS. (Doc. 83). This Court concluded that the third sentence of § 6700(a) will determine the amount of penalty that Tarpey owes. (Doc. 83 at 3). The third sentence provides the individual is liable for "50 percent of the gross income derived from the activity" when the individual organized an entity, plan, or arrangement under § 6700(a)(1) and made false or fraudulent statements in connection with the

4

organization of an entity, plan, or arrangement. (Doc. 83 at 4, *citing* 26 U.S.C. § 6700 (a)). Thus, the penalty amount should be 50 percent of the gross income that Tarpey derived from the "activity" at issue. (Doc. 83 at 4, *citing* 26 U.S.C. § 6700(a)). The parties disputed what constituted the "activity." (Doc. 83 at 4).

Tarpey sought to limit the "activity" at issue to appraisals performed for DFC by Tarpey. (*Id.*). The Government argued that the "activity" should constitute the entire timeshare donation program. (*Id.* at 4–5). This Court determined that the "activity" encompassed the entire arrangement facilitated and organized by Tarpey to solicit timeshare donations, appraise the timeshares, and direct the profits to other organizations that he controlled. (*Id.* at 6). This Court viewed the entire timeshare donations scheme, including the related for-profit entities, as a "particular, well-defined activity" for purposes of calculating the penalty under § 6700. (*Id.* at 9). This Court also concluded that the income derived from DFC could be imputed to Tarpey. (*Id.* at 16).

The penalty amount against Tarpey represents the final issue before the Court. (*Id.* at 16). Initially, the Government simply submitted the IRS Forms 4340 to support its penalty calculation. (*Id.* at 17). These forms provided no detail about how the Government calculated the penalty and, more importantly, the numbers did not add up. (*Id.* at 17). The Court requested that the United States "present a thorough and accurate assessment of Tarpey's penalty amount, to ensure that no

double-counting or errors occur." (*Id.* at 18). To calculate the penalty, the gross income derived from the "activity" must be calculated. 26 U.S.C. § 6700(a). The activity from January 1, 2010 through December 31, 2013 represents the appropriate time period for this calculation. (Doc. 11 at 37).

## BURDEN OF PROOF

Penalties assessed by the Government are presumptively correct. *See In re MDL-731-Tax Refund Litigation of Organizers & Promoters of Investment Plans Involving Book Properties Leasing*, 989 F.2d 1290, 1303 (2d Cir. 1993). The taxpayer bears the burden to show that the assessment is incorrect, at which point the burden shifts to the Government to persuade the factfinder. *See Apollo Fuel Oil v. United States*, 195 F.3d 74, 76 (2d Cir. 1999).

The IRS's assessment is invalid when it is erroneous. *See Cohen v. Commissioner*, 266 F.2d 5, 11 (9th Cir. 1959). The Court must redetermine the deficiency when the Government's assessment is shown to be invalid. *Id.* The presumption of correctness no longer applies. *Id.* The Court should use all evidence in the record to decide the correct assessment amount supported by credible evidence. *See Herbert v. Commissioner*, 377 F.2d 65, 70 (9th Cir. 1966). The Government currently bears the burden of establishing the amount of income the taxpayer received from the activity. *See id.*

## ANALYSIS

The Government has submitted multiple different calculations using several different methods. (Doc. 122 at 217). Following from the fact that the Government has not been consistent with its assessment amount, the Court declines to presume the correctness of the initial calculations. These erroneous calculations have stripped the Government's assessment of its presumption of correctness. The Court must redetermine the penalty amount using all evidence in the record and that amount must be supported by credible evidence. The burden of proof rests now on the Government to establish by a preponderance of evidence the amount of gross income that Tarpey received from the activity defined in the Court's previous order from 2010 to 2013.

The Government's expert ("Dubinsky") sought to assess the amount of gross income earned by the timeshare donation program between 2010 and 2013 to "present a thorough and accurate assessment of Tarpey's penalty amount, to ensure that no double-counting or errors occur," as the Court ordered. (Doc. 83 at 18). Dubinsky has determined that Tarpey earned $22,323,437 in gross income from the activity between 2010 and 2013. (Doc. 122 at 34). A gross income of $22,323,437 would result in a penalty of $11,161,718.50 under I.R.C. § 6700(a).

Dubinsky identified, and included income from, five entities over which Tarpey exercised control: (1) DFC; (2) VPA; (3) Resort Closings; (4) Timeshare

Specialist; and (5) Charity Marketing. (Doc. 122 at 40–41). Dubinsky determined that the activity received income from three sources: (1) the DFC program fee; (2) the resort transfer and maintenance fees; and (3) the purchase price for the timeshare. (Doc. 122 at 48). To reach his gross income amount, Dubinsky explained that he took all the aggregate transactional data from QuickBooks and identified the DFC related transactions. (*Id.* at 50–51). The total transactional data amount was $94,834,901.25. (*Id.* at 55).

To sort out these DFC related transactions, Dubinsky only included the transactions coded "DFC Timeshares." (Exh. 653 at ¶ 65). The total amount related to the DFC transactions was $36,327,061.06. (Doc. 122 at 55). Dubinsky only included an amount in the DFC related transactions if the source of the transaction was known. (Doc. 122 at 55). Dubinsky only included income entering the structure from donors or buyers. (*Id.* at 58).

Dubinsky next removed all internal transfers between the Tarpey entities. (*Id.* at 51). This calculation resulted in Dubinsky's final gross income number. (Doc. 122 at 51). DFC reported gross receipts on its amended tax returns that were only $1,000,000 less than Dubinsky's gross income calculation. (*Id.* at 59). Dubinsky ultimately calculated a gross income of $22,323,437. This amount would result in a penalty of $11,161,718.50. The United States requested, however, that the Court order Tarpey to pay a penalty of $8,465,000 plus interest. (*Id.* at 60,

252). This amount represents the penalty originally requested by the Government in its counterclaim. (Doc. 38 at 37–38).

Tarpey's expert ("Copley") conducted two calculations to determine the gross income. (Doc. 122 at 120). Copley based the first calculation on the gross receipts of DFC and resulted in a gross income of $3,002,246, with a corresponding penalty amount of $1,501,123. (*Id.* at 120). Copley's second calculation determined a gross income of $9,031,350; which resulted in a penalty amount of $4,515,675. (*Id.* at 120). Copley calculated this amount by totaling all the funds related to the timeshare program and deducting the costs of acquiring and selling the timeshares. (*Id.* at 127–28).

Tarpey separately raises four issues with Dubinsky's calculation of gross income: (I) Dubinsky included as gross income payments that were made to an alleged escrow account; (II) Dubinsky failed to deduct expenses that should have been capitalized under I.R.C. § 61(a)(3); (III) Dubinsky included as gross income the amount that DFC legitimately transferred to charities; and (IV) Dubinsky ignored the fact that Tarpey's wife owned 50 percent of one of the entities involved in the activity during part of the specified time period. (Doc. 122 at 220–26). The Court analyzes each of these four issues in turn.

**I. Whether Tarpey's account met the legal definition of an escrow account.**

Tarpey argues that Dubinsky incorrectly included transactions that went through the RCI Wells Fargo Checking Account ending in 96655 ("Account 96655") as part of the activity's gross income. Tarpey claims that Account 96655 served as an escrow account. (Doc. 122 at 220). A taxpayer's gross income normally does not include money paid into escrow because the taxpayer lacks "complete dominion" over the sum. *Ware v. Comm'r*, 906 F.2d 62, 65 (2d Cir. 1990). The total penalty would be $6,850,195 if the Court deducted the money paid into Account 96655. *Id.* at 89.

Dubinsky defers to the Court as to whether Account 96655 falls into the legal definition of an escrow account. (Doc. 122 at 72). In his rebuttal report, however, Dubinsky reiterated that the proper penalty calculation integrated the fees paid into Account 96655. (Doc. 116-10 at 5). Dubinsky asserts that Copley's calculation ignores the Court's order that the penalty include all income derived from the timeshare scheme across all of Tarpey's entities. *Id.* Dubinsky points out that even if Account 96655 served as an escrow account, Copley's calculation undervalues gross income by excluding money paid from Account 96655 to businesses controlled by Tarpey other than DFC, including VPA, Charity Marketing, and Timeshare Specialist. *Id.*

10

Tarpey did not maintain a true escrow arrangement. A true escrow arrangement operates at an arm's length, and provides a bona fide agreement between three independent parties—a buyer, a seller, and an escrow agent. *See Reed v. Comm'r*, 723 F.2d 138, 144 (1st Cir. 1983). Unlike a true escrow arrangement, Account 96655 failed to operate at "an arm's length" from Tarpey. The escrow agent was not independent. Another Tarpey-owned entity—Resorts Closings, Inc.—acted as the "escrow agent" for Account 96655. (Doc. 115-5 at 3). The Court already has determined that the "activity" giving rise to the penalty encompasses "the related for-profit entities" involved in the time-share donation scheme. (Doc. 83 at 9). The "related for-profit entities" include Resorts Closings. *Id.*

Account 96655 differs significantly from the escrow account discussed in *Ware v. Commissioner*, the case Copley cites in support of the proposition that escrow money should be excluded from gross income. In *Ware*, the First Circuit determined that the question of whether the money processed through the escrow account should be included as income represents the key inquiry. *Ware v. Comm'r*, 906 F.2d at 65. An independent escrow agent in *Ware* controlled funds placed in the escrow account. *Id.* A law firm entitled to the funds could not access the money until distribution. *Id.* Tarpey, by contract, exercised complete dominion over the money paid into the account. (Doc. 122 at 75).

11

The test to determine whether a taxpayer enjoys "complete dominion" over a given sum does not assess whether the taxpayer's use of funds remains unconstrained during some interim period. *Comm'r v. Indianapolis Power & Light Co.*, 493 U.S. 203, 210 (1990). The key determination instead involves whether the taxpayer possesses some guarantee that the taxpayer will be allowed to keep the money. *Id.* Tarpey exercised "complete dominion" over Account 6655, as evidenced by the comingling of funds from multiple donors and frequent bulk transfers from the account to address expenses or fees without delineating to whom the money belonged. *Id.* at 93. The money flowing through Account 96655 was not only *includable* as income, it actually was *included* as income in Tarpey's amended tax returns. (Doc. 122 at 245). The fact that Tarpey claimed money from the escrow account on his amended tax returns demonstrates conclusively that the money in Account 96655 remained within Tarpey's control. (Doc. 122 at 172).

Tarpey's complete dominion over Account 96655 demonstrates that the account did not operate as an escrow account. Account 96655 served instead as another way for Tarpey to transfer income from one of his entities to another entity. Virtually all of the money involved in the timeshare scheme flowed through Account 96655. (Doc. 122 at 107). Account 96655 did not operate as an escrow account and the fees paid into it properly should be considered gross income for purposes of calculating a penalty. *See Indianapolis Power & Light Co.*, 493 U.S. at

209 (holding that income includes all earnings that lack "an obligation to repay" and remains "without restriction as to disposition" (quoting *James v. United States*, 366 U.S. 213, 219 (1981))).

## II. Whether the expenses should have been capitalized.

Tarpey next argues that he should be allowed to capitalize his expenses pursuant to IRC §263A because he acted as a dealer in real property. (Doc. 115-5 at 3). Tarpey originally organized DFC as a tax-exempt 501(c)(3) organization. (Doc. 116-4 at 6). Tarpey asserts that the IRS's revocation of DFC's tax-exempt status should lead the Court now to consider DFC to be a for-profit corporation dealing in real property and thus subject to the provisions of IRC §§263, 61(a)(3). (Doc. 122 at 226-27).

The Government argues that DFC could not have acted as a dealer in real property because it never held itself out to be one and it used accounting methods unavailable to dealers in real property. (Doc. 116-10 at 8). It appears Tarpey never contemplated operating DFC as a dealer in real property during his time running the company. Tarpey chose to organize DFC as a 501(c)(3) and Tarpey's malfeasance caused DFC to lose its tax-exempt status. (Doc. 122 at 247). Tarpey now would have the Court transform that punishment into a potential benefit.

A taxpayer remains free to organize their affairs as the taxpayer chooses. Once having chosen an organization, however, the taxpayer must accept the tax

consequences of this choice, whether contemplated or not, and may not enjoy the benefit of some other route the taxpayer might have chosen to follow. *Comm'r v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974); *see also Wilkin v. United States*, 809 F.2d 1400, 1402 (9th Cir. 1987) (holding that it was of no consequence that Wilkin's penalty would have been lower had he bought securities as a limited partner of a foreign partnership because he "did not in fact do so").

Tarpey chose to organize DFC as a nonprofit and he has presented no evidence that he ever intended DFC to act as a dealer in real property. The Court calculates Tarpey's gross income based on the kind of corporation that Tarpey chose for DFC, rather than the type of organization that Tarpey now wishes it were. The Court declines to capitalize Tarpey's penalty in accordance with tax code provisions designed for real property dealers.

### III. Whether the charitable donations should have been deducted from gross income.

Tarpey argues that the signed agreement between DFC and its clients obligated DFC to make donations to legitimate charities through Tarpey's businesses. (Doc. 122 at 222). Tarpey argues that the charitable donations should be deducted from the Government's gross income calculation. *Id.* The charitable donations account for approximately $1.5 million of Dubinsky's gross income calculation. *Id.* at 154.

The Government previously deducted the charitable donations from its calculation of gross income. *Id.* at 83–86. The charitable donations account for approximately $1.5 million of Tarpey's gross income. (Doc. 122 at 153). The amount attributed to charitable donations may have made a difference in assessing the penalty amount when the Government initially calculated its $8,465,000 penalty. The Government now argues, however, that the gross income calculation has grown. The Government did not explain the origins of its initial penalty assessment. The Government chose to rely instead on the IRS 4340 forms. (Doc. 83 at 17). A proposed penalty of $8,465,00 corresponds, however, to roughly $16,930,000 in gross income from the activity. The Government now calculates Tarpey's gross income from the activity as $22,323,437. (Doc. 122 at 34). Even if the Court were to subtract $1.5 million in charitable contributions from the adjusted gross income calculation for the activity, it would still result in a penalty of $10,411,718.50, which far exceeds the $8,465,000 penalty that the Government seeks.

Dubinsky argues that the charitable donations should be included under the proper method for calculating gross income for the activity. Dubinsky notes that Tarpey made the donations on the back end of his timeshare transactions. Tarpey used income that he had received from the timeshare sale to make these donations. *Id.* at 83–86. Gross income includes "all income from whatever source derived."

15

I.R.C. § 61(a)-(b). Gross income includes, but is not limited to, "compensation for services, including fees, commissions, fringe benefits, and similar items" and "gross income derived from business." *Id.* Tarpey's clients did not give these donations directly to the charities. Tarpey himself donated money earned off the timeshare transaction. (Doc. 122 at 86).

In a manner similar to Account 96655, Tarpey exercised complete dominion over the money that he eventually donated to the charities. Tarpey seeks to distinguish his control over the charity donations by arguing that DFC's Donation Agreement obligated him to make the donations. (Doc. 122 at 129); *see* (Doc. 116-26 (DFC Donation Agreement)). The Donation Agreement does not allow the clients, however, to retain the money until it is donated. The donation must come from Tarpey's income. The charitable donations in this case simply represent another business expense for Tarpey to pay. Business expenses should not be deducted from gross income for purposes of the penalty calculation. (Doc. 122 at 138).

**IV. Whether Tarpey's wife's interest in one of the entities involved in the timeshare should have been deducted from gross income.**

Tarpey's wife owned a fifty percent interest in Timeshare Specialist during 2013, according to Timeshare Specialist's tax returns for that year. (Doc. 115-9 at 7). The Court considered Timeshare Specialist to be one of the five entities comprising the timeshare scheme. (Doc. 122 at 224). Tarpey argues that fifty

16

percent of the income derived from Timeshare Specialist through the timeshare scheme during 2013 should be deducted from Dubinsky's total gross income calculation. *Id.* Tarpey's wife's portion accounted for approximately $1.2 million of Tarpey's gross income. (Doc. 122 at 225-26).

The Court notes first that exclusion of the $1.2 million that Tarpey seeks to attribute to his wife would have no effect on the outcome. The Government asserts that the five entities at issue generated gross income of $22,323,437 during the period of 2010 to 2013. (Doc. 122 at 34). This level of gross income would support a penalty of $11,161,718.50 based on the 50 percent of gross income generated by the activity authorized by I.R.C. § 6700(a). The excision of the $1.2 million that Tarpey seeks to attribute to his wife would lower the gross income of the activity to $21,123,437. The accompanying penalty under § 6700(a) for this level of gross income would be approximately $10,561,718.50. This amount far exceeds the penalty of $8,465,000 plus interest sought by the Government. (Doc. 122 at 252).

The Government separately rebuts Tarpey's argument by noting that Tarpey admitted to sole ownership and control of all of the entities involved in the timeshare scheme, including Timeshare Specialist, through 2014. *See* (Doc. 12 at 6 (admitting ¶ 23 of the Government's counterclaim which stated "Until 2014, Tarpey exercised sole control over Resort Closings, Charity Marketing, and Timeshare Specialists as their 100% owner and president")).

17

Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. *In re Barker*, 839 F.3d 1189, 1195 (9th Cir. 2016). Judicial admissions conclusively bind the party who made them. *Id.* Tarpey admitted to sole ownership and control of Timeshare Specialist. He did not file any amendment to that admission, he did not assert his wife's fifty percent interest in any subsequent pleadings, and he failed to account for his wife's alleged interest in either Copley's report or his rebuttal report as a point of error. Tarpey argued that his wife's partial ownership of Timeshare Specialist in 2013 impacted gross income calculations exactly once—during the Court's hearing on May 4, 2021. (Doc. 122 at 225).

Tarpey now argues that Tarpey's wife's portion of the business should be deducted from the Government's penalty calculation "unless the Government shows that the creation of that entity or naming her as an owner is a sham." *Id.* The Government has no such burden, however, where Tarpey already has admitted sole ownership and control of Timeshare Specialist as this "dispenses with the need for proof of that fact." *Atencio v. TuneCore, Inc.*, No. CV161925DMGMRWX, 2018 WL 6265073, at *9 (C.D. Cal. Nov. 13, 2018). The Court affords Tarpey's prior judicial admission the binding effect it is due and finds that Tarpey is the sole owner of Timeshare Specialist.

## CONCLUSION

Tarpey has raised several errors with the Government's penalty calculation, but none of his objections have merit. Tarpey's business practices have brought us to this point today and the Government's penalty accurately reflects the gross income Tarpey made from his fraudulent timeshare scheme. The Court finally notes that the outcome would not change even if it were to agree with Tarpey on the deduction of the $1.5 million in charitable contributions <u>and</u> the $1.2 million that he seeks to attribute to his wife's interest in Timeshare Specialist from the gross income generated by the activity. The reduction of the $22,323,437 in gross income generated by the activity by the combined $2.7 million would reduce the gross income to $19,623,437. The penalty associated with this reduced figure would be $9,811,718.50. This revised penalty still would exceed the $8,465,000 plus interest sought by the Government.

## ORDER

Accordingly, **IT IS ORDERED** that the Tarpey will be **ASSESSED** a penalty amount of $8,465,000 plus interest.

Dated this 16th day of December, 2021

_____
Brian Morris, Chief District Judge
United States District Court